```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

MARTIN J. STEFANELLI,           :
                                :
    Plaintiff,                  :
                                :
v.                              :     No. 3:03CV1366(DJS)
                                :
LABORATORY CORPORATION OF       :
AMERICAN HOLDINGS,              :
                                :
    Defendant.                  :
```

### MEMORANDUM OF DECISION

Plaintiff, Martin J. Stefanelli, brings this action against Laboratory Corporation of America Holdings ("LabCorp") for damages resulting from LabCorp's breach of contract. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff has filed a motion for summary judgment (dkt. # 22). For the reasons set forth herein, plaintiff's motion is **GRANTED in part** and **DENIED in part**.

### I. FACTS

The issue in this case is whether the defendant corporation, LabCorp, breached its employment agreement when it failed to pay the plaintiff, Stefanelli, severance benefits after Stefanelli terminated his employment with LabCorp. Resolution of this issue depends upon the cumulative effect of three agreements Stefanelli executed with his employers.

A. THE 1989 EMPLOYEE PROPRIETARY INFORMATION AGREEMENT

In 1989, Stefanelli became an employee of Dianon Systems

Limited Partnership (a predecessor to Dianon Systems, Inc., hereafter referred to as "Dianon") at which time he executed an Employee Proprietary Information Agreement (dkt. # 29, Ex. A)(hereinafter referred to as the "1989 Proprietary Information Agreement").  In the relevant provisions in paragraph 9 of the 1989 Proprietary Information Agreement, Stefanelli agreed that

> in consideration of my employment by the Company that [he] will not engage in any competitive business activities or research, or disclose, or use any Company assets, directly or indirectly, in anyway that is similar or competitive with the business of the Company for a period of three (3) years from and after the termination for any reason of [his] employment with the Company.

(Dkt. # 29, Ex. A, ¶ 9).

### B. THE 2001 DIANON EMPLOYMENT AGREEMENT

On September 25, 2001, Stefanelli and Dianon executed the Dianon Employment Agreement (dkt. # 29, Ex. B) (hereinafter referred to as the "2001 Employment Agreement"), which incorporated the 1989 Proprietary Information Agreement.  The 2001 Employment Agreement provides that Dianon will pay Stefanelli severance benefits in the event of the termination of Stefanelli's employment.  The Company's contractual obligation to pay severance benefits occurs when there is (1) a "Change in Control" of the company and (2) "Good Reason" for Stefanelli to terminate his employment.  (Dkt. # 29, Ex. B, ¶ 1).  The 2001 Employment Agreement defines both these terms in paragraph 1 as follows:

> 1. <u>DEFINITIONS</u>
> (a) "Change in Control": merger, acquisition or other stock or asset transaction resulting in a change in ownership of more than 50% of the COMPANY's equity.
>
> . . .
>
> (c) "Good Reason": significant change in STEFANELLI's duties, compensation, or benefits or change of STEFANELLI's principal work location to a place requiring more than sixty minutes driving to or from STEFANELLI's home in peak commuting hours.
>
> . . .
>
> 3. <u>EMPLOYEE'S ACTION TRIGGERING OBLIGATION</u>
> If STEFANELLI resigns employment with the Company for Good Reason within twelve (12) months after a change in control of the COMPANY, then STEFANELLI shall be entitled to payments and benefits described in Section 4 of this Agreement.

(Dkt. # 29, Ex. B, ¶¶ 1, 3).

Paragraph 4 sets forth Dianon's obligation to pay severance benefits. The relevant provisions are recited below:

> If the conditions in Section 2 or Section 3 of this Agreement, occur, then for the one (1) year period commencing with the termination date
>
> (i)  The COMPANY will pay STEFANELLI severance pay at STEFANELLI's most recent rate of total compensation (salary, bonus, stock grant and option value, Company 401k plan contribution, tax benefit of 401k participation plan). . . .

(Dkt. # 29, Ex. B, ¶ 4). Paragraph 4 goes on to set forth the Dianon's obligation to pay premium costs for medical insurance coverage, car allowance, executive life insurance, and outplacement services, in addition to the severance pay, if the conditions in Section 2 or 3 occur.

The 2001 Employment Agreement further provides that if, however, Stefanelli breached the 1989 Proprietary Information Agreement, then Dianon is relieved of its obligation to pay Stefanelli severance benefits.  Paragraphs 6 and 7 both incorporate by reference the 1989 Proprietary Information Agreement.  Paragraphs 6 and 7 provide, in part, the following:

> 6. Except as specifically addressed in this Agreement, the terms and conditions of STEFANELLI's employment by the COMPANY are unaffected by the execution of this Agreement.  For example, STEFANELLI's employment by the COMPANY remains at will; his obligations under a proprietary information agreement continue to apply; his duty of loyalty remains.
>
> 7. Any breach by STEFANELLI of his obligations to the COMPANY under his proprietary information agreement shall not only entitle the COMPANY to legal and equitable relief, it will also relieve the COMPANY of any payment obligation otherwise triggered under this Agreement.

(Dkt. # 29, Ex. B, ¶¶ 6, 7).

### C. THE LABCORP 2003 NON-SOLICITATION AGREEMENT

On or before January 17, 2003, Dianon became a wholly-owned subsidiary of LabCorp. (Compl., ¶ 4).  Subsequent to this purchase, LabCorp and Stefanelli executed a Non-Solicitation/Confidentiality Agreement dated February 7, 2003. (Dkt. # 29, Ex. C) (hereinafter referred to as the "2003 Non-Solicitation Agreement").  The 2003 Non-Solicitation Agreement provides for a six-month non-compete period, rather than the three-year non-compete period provided for in the 1989 Proprietary Information Agreement.  The 2003 Non-Solicitation

Agreement, drafted by LabCorp's law department (dkt. # 35, at 3 n. 1), provides, in part:

> 1.(a) For a period of six (6) months after termination of your employment with LabCorp, you will not directly or indirectly, solicit the medical laboratory testing business of any customers of LabCorp. . . . As used herein, the word "indirectly" includes, but is not limited to, the use of your name by your new employer or any employees of your new employer in the solicitation of the medical laboratory testing needs of said customers.

(Dkt. # 29, Ex. C, ¶ 1).

The critical provision for this case is paragraph 6 of the 2003 Non-Solicitation Agreement:

> 6. It is understood and agreed by you and us that this Agreement constitutes an amendment in its entirety of any non-compete and confidentiality agreement which you may have previously executed in favor of LabCorp or any of its affiliates except that it shall not amend any non-compete or confidentiality agreement executed by you in connection with the purchase by LabCorp of certain assets or the stock of a business entity with whom you were previously employed or affiliated, including, but not limited to, an ownership or investment interest in said entity.

(Dkt. # 29, Ex. C, ¶ 6).

Finally, paragraph 7 defines affiliates to include other business entities "which directly or indirectly, is controlled by, controls or is under common control with us." (Dkt. # 29, Ex. C, ¶ 7). The parties do not dispute that this definition of affiliates includes Dianon.

Shortly after LabCorp acquired Dianon, Stefanelli was informed that the position of Vice President, National Sales and

Marketing for LabCorp required him to move to North Carolina. (Dkt. # 32, Stevan Stark Aff., ¶ 6). According to Stefanelli, the change in control, coupled with the change in location and responsibilities of his job triggered his right to terminate his employment pursuant to the Good Reason Clause of the 2001 Employment Agreement. On February 24 or 27, 2003, Stefanelli gave notice of his resignation to LabCorp, although he continued to work for LabCorp until June of 2003.

Three months after Stefanelli gave notice of his resignation, around May 27 or 28, 2003, LabCorp asserts that it offered Stefanelli "a position with LabCorp in which he would be allowed to remain in Stratford, Connecticut [and] in essence, run the entire operation of what had previously been Dianon."  (Dkt. # 32, Stevan Stark Aff., ¶ 7).

After June of 2003, Stefanelli stopped working for LabCorp and went to work for Ameripath as Chief Operating Officer. Ameripath directly competes with LabCorp in most, but not all, aspects of its medical testing business.  (Dkt. # 30, Ex. A, Stefanelli Dep. at 44-45).  Stefanelli avers that he did not violate the 2003 Non-Solicitation Agreement.  Specifically, Stefanelli states that he did not participate in the hiring of former Dianon employees.  In addition, Ameripath assigned another individual to be directly in charge of sales and marketing until December 2003, six months after Stefanelli's departure from

LabCorp. (Id. at 81-82).  Although LabCorp agrees that this measure was intended to comply with the 2003 Non-Solicitation Agreement, it argues that, as Chief Operating Officer, Stefanelli had "at least indirectly been involved in soliciting LabCorp's customers." (Dkt. # 30, at 10).  LabCorp argues, therefore, that Stefanelli violated Paragraph 1 of the 2003 Non-Solicitation Agreement, which prohibits soliciting, "directly or indirectly," any LabCorp customers.

## II. DISCUSSION

### A.  STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.

1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

### B. CONTRACT INTERPRETATION

Interpretation of these contract provisions is guided by well-established principles of contract law.

> A contract must be construed to effectuate the intent
> of the parties, which is determined from the language
> used interpreted in the light of the situation of the
> parties and the circumstances connected with the
> transaction. . . . [T]he intent of the parties is to be
> ascertained by a fair and reasonable construction of
> the written words and ... the language used must be
> accorded its common, natural, and ordinary meaning and
> usage where it can be sensibly applied to the subject
> matter of the contract. . . . Where the language of the
> contract is clear and unambiguous, the contract is to
> be given effect according to its terms. A court will
> not torture words to import ambiguity where the
> ordinary meaning leaves no room for ambiguity. . . .
> Similarly, any ambiguity in a contract must emanate
> from the language used in the contract rather than from
> one party's subjective perception of the terms.

Tallmadge Brothers, Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479, 498 (2000).

Although ordinarily the question of contract interpretation,

being a question of the parties' intent, is a question of fact, the determination of what the parties intended by their contractual commitments is a question of law where there is definitive contract language.  See id. at 495.  A contract's language is presumed to be unambiguous when the contract is a commercial agreement between sophisticated parties.  See id. at 496.  In an employment context,

> ambiguous terms in a contract of employment are
> generally construed against an employer who drafted or
> exclusively prepared the employment contract.  The
> contract is strictly construed against the employer due
> to the unequal bargaining power between the employer
> and employee and because employees generally must
> accept the contract and personnel rules offered.

27 Am. Jur. 2d, Employment Relationship, § 19 (2004). Additionally, "[w]hether a written contract is ambiguous is a question of law for the court." Duse v. International Business Machines Corp., 252 F.3d 151, 158 (2d Cir. 2001); see also, Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 158 (1991). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms," F & W Welding Service, Inc. v. ADL Contracting Corp., 217 Conn. 507, 517 (1991), and those terms may be the basis for summary judgment, see, e.g., Heyman Associates No. 1 v. Insurance Company of the State of Pennsylvania, 231 Conn. 756, 769 (1995). Finally,

> [c]ourts do not unmake bargains unwisely made. Absent
> other infirmities, bargains moved on calculated

> considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts.

<u>Robert Lawrence Associates, Inc. v. Del Vecchio</u>, 178 Conn. 1, 21-22 (1979) (citation omitted).

Disposition of this motion for summary judgment requires the resolution of five issues: (1) whether the 2003 Non-Solicitation Agreement unambiguously supercedes the 1989 Proprietary Information Agreement; (2) whether the remainder of the 2001 Employment Agreement survives amendment of the 1989 Proprietary Information Agreement; (3) whether the limitation in Paragraph 6 of the 2003 Non-Solicitation Agreement applies; (4) whether LabCorp is obligated to pay severance benefits pursuant to the 2001 Employment Agreement; (5) whether Stefanelli breached the 2003 Non-Solicitation Agreement; and (6) whether Stefanelli correctly calculated the amount of his severance benefits.  Each question is discussed in turn.

1. Whether the 2003 Non-Solicitation Agreement Unambiguously Supercedes the 1989 Proprietary Information Agreement

The 2003 Non-Solicitation Agreement provides that "this Agreement constitutes an amendment <u>in its entirety of any non-compete and confidentiality agreement</u>. . . ."  (Dkt. # 29, Ex. C, ¶ 6) (emphasis added).  By its express language, this new

agreement expressly supercedes "in its entirety" the 1989 Proprietary Information Agreement with Dianon.  The plain language of the 2003 Non-Solicitation Agreement, already clear and unambiguous, is further supported by the context of its execution.  After assuming control of a rival company, this new agreement would help LabCorp ensure that its new employees would now be obligated to their new employer (LabCorp), rather than their previous employer (Dianon), to refrain from competition upon termination of their employment with LabCorp.

LabCorp argues that the 1989 Proprietary Information Agreement remains in effect.  LabCorp's Vice President of Sales and Marketing, Stevan Stark, avers that it was LabCorp's intent that Stefanelli would be allowed to reap the benefits of his 2001 Employment Agreement, which Stefanelli claims is more than $1,000,000, only if Stefanelli adhered to the original three-year non-compete agreement incorporated by reference in the 2001 Employment Agreement. (Dkt. # 32, Stevan Stark Aff., ¶ 5).  LabCorp further argues that "[p]laintiff's argument comes down to this: in exchange for a six-month Non-Solicitation Agreement, LabCorp was willing to forego a three-year covenant not to compete while at the same time providing a payment to plaintiff of over $1,000,000."  (Dkt. # 30, at 7).

Interpretation of an unambiguous contractual provision is not based on "one party's subjective interpretation of the

-11-

terms." <u>Tallmadge Bros., Inc.</u>, 252 Conn. at 498.  Furthermore, the court will not rewrite an unambiguous contract provision improvidently made, especially when defendant itself drafted the contract.  Because the language and intent of the 2003 Non-Solicitation Agreement is clear and unambiguous, the court finds that the 2003 Non-Solicitation Agreement amends in its entirety the previous 1989 Proprietary Information Agreement.  As such, the six-month non-compete period set forth in the 2003 Non-Solicitation Agreement governs.

    2. Whether the Remainder of the 2001 Employment Agreement Survives Amendment of the 1989 Proprietary Information Agreement

Paragraphs 6 and 7 of the 2001 Employment Agreement incorporate by reference the 1989 Proprietary Information Agreement.  Therefore, the court next must address whether the 2003 Non-Solicitation Agreement amends only that portion of 2001 Employment Agreement that incorporates the 1989 Proprietary Information Agreement, or, as LabCorp argues, "if the February, 2003 agreement is deemed to rescind the 2001 agreement, [whether] the parties intended that the entire 2001 agreement (including the provisions which would give plaintiff payments under that agreement) would also be rescinded." (Dkt. # 31, at 3).

The plain language of the 2003 Non-Solicitation Agreement that "this Agreement constitutes an amendment <u>in its entirety of any non-compete and confidentiality agreement</u>," (dkt. # 29, Ex. C, ¶ 6) (emphasis added), means that it amends only that portion

of the 2001 Employment Agreement incorporating the 1989 Proprietary Information Agreement.  No mention is made of amending any other agreement, including the 2001 Employment Agreement.  The language of the 2003 Non-Solicitation Agreement unambiguously refers solely to any non-compete and confidentiality agreement, and therefore only that portion of the 2001 Employment Agreement is affected by the amendment.

The plain and unambiguous language of the 2003 Non-Solicitation Agreement is further supported by an analysis of the two other contracts.  The 2001 Employment Agreement evinces an intent to distinguish between the new terms of employment regarding termination and severance pay (i.e., the Change in Control and Good Reason provisions) from the proprietary information agreement.  Paragraph 6 of the 2001 Employment Agreement provides that "the terms and conditions of STEFANELLI's employment by the COMPANY <u>are unaffected by</u> the execution of this Agreement.  For example, . . . [Stefanelli's] obligations under a proprietary information agreement continue to apply." (Dkt. # 29, Ex. B, ¶ 6) (emphasis added).  Paragraph 7 further provides that any breach by Stefanelli "under his proprietary information agreement . . . will also relieve the COMPANY of any payment obligation <u>otherwise triggered</u> under this Agreement. . . ." (Dkt. # 29, Ex. B, ¶ 7) (emphasis added).  The express terms of the 2001 Employment Agreement indicate that the previous terms and

conditions, including the 1989 Proprietary Information Agreement, "<u>are unaffected by</u>" the new 2001 Employment Agreement. (Dkt. # 29, Ex. B, ¶ 6) (emphasis added).  Similarly, the severance pay obligation is "<u>otherwise triggered</u>" by the terms included in the 2001 Employment Agreement. (Dkt. # 29, Ex. B, ¶ 7) (emphasis added).  These provisions indicate that the severance pay obligations outlined in the 2001 Employment Agreement exist independently from the obligations under the 1989 Proprietary Information Agreement, although the breach of the latter relieves the employer of its severance pay obligation set forth in the former.

In addition, the subject matter of the 2003 Non-Solicitation Agreement relates exclusively to matters of confidentiality, trade secrets, and covenants not to compete.  The 2003 Non-Solicitation Agreement makes no mention of the 2001 Employment Agreement nor of any of the terms in the 2001 Employment Agreement such as Change in Control, Good Reason, or the employer's obligation to pay severance benefits.  The unambiguous language of the 2003 Non-Solicitation Agreement evinces an intent by both parties to commit to a new non-compete agreement rather than rewrite an entire employment agreement.  Therefore, the court finds that the 2003 Non-Solicitation Agreement amends only that portion of the 2001 Employment Agreement that incorporates the previous 1989 Proprietary Information Agreement.

### 3. Whether the Limitation in Paragraph 6 of the 2003 Non-Solicitation Agreement Applies

Paragraph 6 of the 2003 Non-Solicitation Agreement, which states that "this Agreement constitutes an amendment in its entirety of any non-compete and confidentiality agreement," further contains a proviso limiting its application as follows: "except that it shall not amend any non-compete or confidentiality agreement executed by you in connection with the purchase by LabCorp" of the ownership interest of a previous employer.  (Dkt. # 29, Ex. C, ¶ 6).  LabCorp argues that this limitation preserves the 1989 Non-Solicitation Agreement, because the terms thereof were incorporated into the 2001 Employment Agreement and the 2001 Employment Agreement was executed by Stefanelli in connection with LabCorp's purchase of Dianon in 2003.  (Dkt. # 30 at 10).  Stefanelli, in his original affidavit, denies that he had executed the 2001 Employment Agreement in connection with the purchase of Dianon since he was unaware of the purchase.  (Dkt. # 23, ¶ 6).  LabCorp has not submitted any proof that LabCorp's purchase of Dianon was pending when Stefanelli executed the 2001 Employment Agreement or that the 2001 Employment Agreement was executed in connection with this purchase.  Rule 56 requires more than mere allegations and argument to defeat a motion for summary judgment.  LabCorp's argument must fail because no reasonable jury could infer from the facts alleged that the 2001 Employment Agreement was executed

in connection with the purchase of Dianon.

### 4. Whether LabCorp is Obligated to Pay Severance Benefits Pursuant to the 2001 Employment Agreement

For Stefanelli to be entitled to the severance pay after he terminated his employment with LabCorp, three conditions must be satisfied under the terms of the 2001 Employment Agreement: (1) There was a "Change in Control" of the company; (2) Stefanelli terminated his employment within twelve months after the change in control; and (3) Stefanelli had "Good Reason," as that term is defined in Paragraph 1(c) of the 2001 Employment Agreement, to terminate his employment.

In this case, the first two requirements necessary to trigger the LabCorp's obligation to pay severance benefits have been satisfied. The parties agree that LabCorp wholly acquired Dianon in January of 2003, therefore there cannot be a material dispute that there was a change in control. Additionally, Stefanelli gave notice of his resignation one month later in February of 2003 and ultimately stopped working for LabCorp five months later in June of 2003. Because Stefanelli provided notice within the twelve-month time period after the change in control, there is no need to determine whether Stefanelli's resignation was effective in February or June. Therefore, the first two conditions required to obligate LabCorp to pay Stefanelli severance benefits have been fulfilled.

The parties disagree whether the third requirement has been

met.  Stefanelli submits that, to maintain his same position, LabCorp required him to move to North Carolina. (See Dkt. # 23, Stefanelli Dep. at 122).  LabCorp agrees that the position would have required Stefanelli to move to North Carolina, but describes this event as an initial offer to Stefanelli, who "was later offered a different position which would have permitted him to remain in Stratford, Connecticut." (Dkt. # 31, ¶ 4; Dkt. # 32, Stevan Stark Aff., ¶ 6). This later offer, however, occurred around May 27 or 28, 2003, some three months after LabCorp offered the  position in North Carolina in February 2003.  This second offer in May 2003 is wholly irrelevant as to whether Stefanelli had Good Reason to terminate his employment in February of 2003.  Additionally, the subsequent offer would have led to a "significant change" in Stefanelli's duties (i.e., running "the entire operation of what had previously been Dianon,") thereby also triggering the obligation to pay severance benefits.  (Dkt. # 32, Stevan Stark Aff., ¶ 7).

   The court finds, as a matter of law, that , pursuant to the terms of the 2001 Employment Agreement, LabCorp's obligation to pay Stefanelli severance benefits was triggered by the events occurring prior to Stefanelli's notice of resignation in February 2003.

### 5. Whether Stefanelli Breached the 2003 Non-Solicitation Agreement

Because the court finds that the 2003 Non-Solicitation Agreement, which provides for a six-month non-compete agreement is controlling, the court examines Stefanelli's conduct during the first six months after Stefanelli's departure from LabCorp in June 2003 through December 2003, while he was employed by Ameripath. For purposes of summary judgment, the court accepts that Ameripath is a direct competitor of LabCorp. Stefanelli, in his original affidavit, avers that he has not violated any "of the provisions of the non-solicitations/confidentiality agreement." (Dkt. # 23, Martin Stefanelli Aff., ¶ 10). To defeat summary judgment, the nonmovant's evidence must be sufficient to support a reasonable jury's verdict. See Liberty Lobby, 477 U.S. at 250-252. LabCorp does not allege any specific credible facts that Stefanelli violated the non-compete agreement between June 2003 and December 2003. LabCorp's argues that, as Chief Operating Officer at Ameripath, Stefanelli "has at least indirectly been involved in soliciting LabCorp's customers." (Dkt. # 30, at 11). This unfounded speculation cannot meet the evidentiary standard set forth in Rule 56. Because no jury could reasonably infer from the facts alleged that Stefanelli competed, directly or indirectly, with LabCorp while employed at Ameripath, the court finds that Stefanelli has not violated the six-month non-compete agreement.

### 6. Whether Stefanelli Correctly Calculated his Severance Benefits

Paragraph 4 of the 2001 Employment Agreement provides that, if Stefanelli resigns employment for Good Reason within twelve months after a change in control of his employer, then for the one-year period commencing with the termination date, LabCorp must pay Stefanelli at his most recent rate of total compensation, including salary, bonus, stock grant and option value, 401k plan contribution, and tax benefit of 401k participation plan.  Paragraph 4 goes on to provide for LabCorp's obligation to pay for premium costs for medical insurance coverage, car allowance, executive life insurance, and outplacement services, in addition to the severance pay. Stefanelli has calculated the total value under Paragraph 4 of the 2001 Employment Agreement to be $1,031,803.  (See Dkt. # 23). LabCorp has calculated the total value to be $827,315, excluding unvested options and excise tax.  (See Dkt. # 30).

Because the correct amount to be awarded under Paragraph 4 of the 2001 Employment Agreement is a material disputed fact, this issue must be resolved at trial.

### III. CONCLUSION

For the reasons set forth herein, there is no genuine issue of material fact with respect to LabCorp's liability for breach of contract, but the amount of damages awarded must be resolved at trial.  Therefore, Stefanelli's motion for summary judgment

(dkt. # 22) is **GRANTED in part** and **DENIED in part**.  This case is referred to the Honorable Thomas P. Smith, United States Magistrate Judge, for the purpose of conducting a settlement conference.  The parties shall file their joint trial memorandum on or before **July 22, 2005.**

   So ordered this 27th day of May, 2005.

                                        **/s/DJS**
                            _____
                            **DOMINIC J. SQUATRITO**
                        **UNITED STATES DISTRICT JUDGE**